IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA,

| | |
|---|---|
| CHARLOTTE L. OWENS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-cv-636-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Charlotte L. Owens, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 7).

## Introduction

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). The evidence establishing a disability must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is

disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, a thirty-nine-year-old female, filed her applications for disability benefits on June 29, 2005, alleging an onset date of November 1, 2000. (R. 17, 337). Plaintiff alleged that her mental health issues, arthritis, and back pain prevented her from working. (R. 117, 399). Her claim was denied initially on November 15, 2005, and upon reconsideration on August 18, 2006. (R. 17). On December 20, 2007, plaintiff received a hearing before an administrative law judge ("ALJ"). (R. 270-94). Following that hearing, the ALJ issued a decision finding that plaintiff was not disabled. (R. 339-49). After the Appeals Council denied review, plaintiff filed an appeal with the Court. (R. 357-60).

On appeal, the Commissioner conceded that remand was appropriate in that case because the administrative law judge ("ALJ") violated plaintiff's procedural due process rights.[1] (R. 355). This Court remanded the case to the ALJ for a *de novo* hearing on June 30, 2009.[2] Id. That hearing was held on December 9, 2009. (R. 521-50). Following the *de novo* hearing, the ALJ issued a second decision denying plaintiff's application for disability benefits on January 20, 2010. (R. 327). The Appeals Council denied review, and plaintiff filed this appeal with the Court. (R. 350).

---

[1] At the conclusion of the hearing on December 20, 2007, the ALJ determined that he needed additional medical evidence to render a decision. (R. 279-280). He ordered plaintiff to attend a consultative mental examination and advised that he would permit all parties to review the examiner's report and have an opportunity for cross-examination before he issued his decision. (R. 282). Contrary to his order, however, the ALJ issued his decision upon receipt of the examiner's report, thereby violating plaintiff's right to a full and fair hearing. (R. 230, 339).

[2] While her appeal was pending with this Court, plaintiff filed another application for disability benefits on September 17, 2008. (R. 327). That application was denied initially on January 7, 2009, and upon reconsideration on March 31, 2009, prior to the remand of the first case. Id. The record does not indicate whether the parties agreed to dismiss the second application or whether it was merged with the first application in light of the remand order for a *de novo* hearing.

**Plaintiff's Work History**

Plaintiff left school after repeating the tenth grade and later obtained her GED. (R. 403). Plaintiff reported previous jobs as an assembler, cashier, janitor, and secondary machine operator. (R. 406). Plaintiff's last job was as a cashier at a thrift store. (R. 532). Plaintiff testified that she left that job voluntarily because she forgot to report to work and was so embarrassed that she never went back. (R. 532-33).

**Plaintiff's Mental Health History**

Plaintiff reported a traumatic childhood marked by sexual abuse at the hands of family members. (R. 281-82). Plaintiff was hospitalized in 2000 following a suicide attempt. (R. 129). Plaintiff reportedly slit her wrist after an argument with her boyfriend. (R. 127). The hospital diagnosed plaintiff with depressive disorder and alcohol abuse. Id. Plaintiff responded to medication and treatment and was discharged. Id.

Following that hospitalization, plaintiff reported that she began therapy and medication management at CREOKS. (R. 277). The record reflects, however, that plaintiff first sought treatment at CREOKS in April 2005. (R. 211). Plaintiff's ex-husband, the father of her children, had just died, and plaintiff sought help to address her grief. (R. 215). CREOKS diagnosed plaintiff with post-traumatic stress disorder ("PTSD") and severe bipolar II disorder with psychotic symptoms. (R. 254).

Plaintiff underwent the first of three consultative mental examinations associated with these proceeding on October 10, 2005. (R. 150). Dr. Michael Morgan examined plaintiff and conducted tests to assess her mental state. Id. Plaintiff reported symptoms of depression and use of alcohol and marijuana within the last few months. (R. 152). Dr. Morgan diagnosed plaintiff

with chronic PTSD, major depressive disorder, alcohol abuse, cannabis abuse,[3] and borderline personality disorder. (R. 154). He concluded that plaintiff would be able to attain a "more normal level of psychological functioning" within a few years if she abstained from using drugs and alcohol and sought regular treatment. Id.

Plaintiff continued her treatment at CREOKS. In October, 2006, plaintiff's diagnosis was reduced to moderate major depression. (R. 203). By June 2007, plaintiff's response to medication was improving. (R. 222).

In response to the ALJ's order following the first hearing, plaintiff attended her second consultative medical examination on February 25, 2008. (R. 230). Dr. Denise LaGrand examined plaintiff and conducted tests to assess her mental state. Id. Plaintiff reported concentration and memory problems, irritability, confusion, "hearing voices," flashbacks, panic attacks, depression, sleep problems, blackouts, anger issues, headaches, and PTSD. She reported some of these problems began in childhood, while others became apparent later. Plaintiff claimed her difficulty controlling her anger affects her ability to work and get along with her co-workers and supervisors, and the flashbacks "make concentration and focus extremely challenging." Id. Dr. LaGrand diagnosed plaintiff with PTSD, panic disorder with agoraphobia, moderate major depression, and occupational problems, assigning plaintiff a GAF score of 50. (R. 236). Dr. LaGrand also completed a mental source statement on plaintiff's ability to do work-related activities. (R. 238). She determined that plaintiff had the following limitations: mild limitations in understanding and remembering complex instructions and in "responding appropriately to

---

[3] Plaintiff candidly admitted her prior use of alcohol and marijuana to two of the doctors who examined her and denied alcohol or drug use with the other two doctors. (R. 150, 197, 234, 478). The record indicates that plaintiff likely last used marijuana in 2005 and alcohol in 2007. (R. 150, 234). The ALJ did not find that plaintiff's substance abuse was an issue in his decision, other than as a factor in assessing her credibility. (R. 336).

usual work situations and changes in a routine work setting;" moderate limitations in carrying out complex instructions and in making judgments on "complex work-related decisions;" and difficulty with regular work attendance. (R. 238-39).

On remand, the ALJ sent plaintiff for a third consultative medical examination with Dr. David Hansen. (R. 478). Dr. Hansen diagnosed plaintiff with major depression, PTSD, and probable borderline personality disorder. (R. 478-80). Dr. Hansen concluded that "the psychological stressors of a typical work day will place [plaintiff] at greater risk for mood exacerbation similar to the past." (R. 479).

On the date of the second ALJ hearing, plaintiff was continuing her treatment at CREOKS. (R. 529, 537-38). She testified that CREOKS had helped her obtain housing and utility services. (R. 538). Plaintiff also testified that she attended day-long sessions at CREOKS twice a week. (R. 537-38). During these sessions, plaintiff would attend two group therapy sessions, work with others to complete chores, and make lunch. Id. Plaintiff stated that she learned about her mental illness and about coping skills during these sessions. Id.

In addition to the consultative examinations, the Commissioner also completed two Psychiatric Review Technique ("PRT") forms and two mental Residual Functional Capacity ("RFC") assessments on plaintiff during the course of the disability proceedings. (R. 157, 171). Agency doctors completed these assessments by reviewing the medical records; they did not examine or treat plaintiff. Id. The PRT form addressed plaintiff's symptoms and the four areas of functional limitations necessary for plaintiff to meet or medically equal a listing. Id. The mental RFC assessment determined which mental work activities plaintiff could perform and what limitations she would have. (R. 171).

The first PRT form and the first mental RFS assessment were completed on November 1, 2005. (R. 157, 171). The PRT form stated that plaintiff did not meet or medically equal a listing for a mental disorder. (R. 157-166). The PRT form also stated that plaintiff had mild restrictions in her activities of daily living and moderate restrictions in maintaining social function and in concentration, pace, and persistence. (R. 167). The mental RFC assessment found moderate limitations in the following areas: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) accepting instructions and criticisms from a supervisor; and (5) maintaining a good working relationship with coworkers. (R. 171-72). Plaintiff had marked limitations in her ability to "interact appropriately with the general public." (R. 172). The form contained a detailed explanation of plaintiff's limitations and abilities that reflected these findings. Id.

The second PRT form and mental RFC assessment were completed on January 6, 2009. (R. 482, 486). The second PRT form concluded that plaintiff's condition had deteriorated somewhat. She now had moderate restrictions in her activities of daily living, in maintaining social function, and in concentration, pace, and persistence. (R. 496). The second mental RFC assessment was identical to the first. (R. 482).

**Plaintiff's Physical Health**

Plaintiff sought treatment at the Latimer Christian Clinic for pain on three different occasions. (R. 508-518). In October 2006, plaintiff complained that she had suffered back pain for a week. (R. 518). She had sought relief with a heating pad. Id. In October 2008, plaintiff presented with complaints of pain in both knees and in her lumbosacral region. (R. 514). In May 2009, plaintiff complained of arthritis pain in her knees and back and stated that her pain

medication was no longer working. (R. 509). Finally, in August 2009, plaintiff complained that the discs in her back felt as though they were rubbing together. (R. 508).

Dr. Seth Nodine completed a consultative examination of plaintiff in August 2006. (R. 197). Dr. Nodine registered plaintiff's complaints of lower back pain, numbness in her arms and legs, and difficulty grasping objects. Id. He found some tenderness on plaintiff's "spinous process and paraspinous lunbar muscles" and very slight limitations in plaintiff's right hip rotation, but otherwise, there were no abnormalities. (R. 199-200). Dr. Nodine diagnosed plaintiff with "chronic pain as described." (R. 199).

**The ALJ Hearing**

At the hearing on December 9, 2009, the ALJ heard testimony from plaintiff and from a vocational expert. (R. 521-50). Plaintiff described her current treatment at CREOKS, which included twice-weekly day-long therapy sessions to address her mental illness. (R. 529). She discussed her traumatic childhood, which caused her to suffer from PTSD. (R. 530-31). Plaintiff described her mind as "a racetrack car going around. . . most of the time." (R. 530). She stated that, on her bad days, she felt like "everybody's just coming in at me" and she sank into a depression. (R. 530, 539). The therapy helped her have time to sort through her thoughts. (R. 529-30). Plaintiff also testified to a long history of back pain from arthritis and a car accident. (R. 532, 534). She complained of knee pain as well (R. 532). Plaintiff described her daily activities but explained that she often had to stop and rest while doing household chores. (R. 544).

Following plaintiff's testimony, the vocational expert testified. He reviewed plaintiff's prior work history as an assembler, a cashier, and a janitor. (R. 546). He classified the assembler and cashier jobs as light work and the janitorial job as medium work, although plaintiff had reported it as light work. Id.

The ALJ then posed the following hypothetical: "Let me give you a hypothetical Claimant of this Claimant's age, educational background, and prior work experience who could do a light exertional range of work, confined to simple uncomplicated tasks with routine supervision." Id. He then amended the hypothetical to also include some complex tasks. (R. 547). The vocational expert testified that plaintiff would be able to do all of her previous work, as well as other light unskilled jobs, such as a mail clerk, a sorter, an office helper or messenger, an assembler, or other jobs masking off parts or polishing items. (R. 547-48). On cross-examination, plaintiff's attorney asked the vocational expert to consider plaintiff's testimony in his hypothetical. (R. 548). The vocational expert testified that plaintiff would not be able to work due to her "bad days," as it would impact her attendance. Id. Plaintiff's attorney then asked whether some of the jobs that the vocational expert had described would include production quotas. (R. 549). The vocational expert responded that they did. Id. When plaintiff's attorney asked whether quotas would increase the stress level of those types of jobs, the ALJ cut off that line of questioning, stating that the vocational expert was "not a psychologist. He cannot testify whether that would be stressful or not." Id.

When plaintiff's attorney asked if the vocational expert was "familiar with the concept of Global Assessment of Functioning," the ALJ stopped the cross-examination over plaintiff's attorney's objection and ended the hearing. (R. 549-50).

**The ALJ's Decision**

The ALJ issued his decision on January 20, 2010, and denied plaintiff's application for benefits. (R. 327-38). The ALJ found that plaintiff had not engaged in any substantial gainful activity since November 1, 2000, and that plaintiff was insured through March 31, 2007. (R. 329). The ALJ found that plaintiff suffered from the following severe impairments: bipolar

disorder, PTSD, depression, and back pain; however, he found that plaintiff did not meet or medically equal a listing for any of those impairments. (R. 329-30).

The ALJ then reviewed plaintiff's testimony and the findings of the consulting physicians, as well as some of plaintiff's medical records. (R. 330-36). He concluded that plaintiff was not entirely credible because "she was inconsistent when she reported to [sic] drug and alcohol abuse to the examining doctors and exaggerated the effects of her impairments." (R. 336). The ALJ also opted to give "great weight . . . to the State Agency medical consultants' opinions." (R. 335). The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with a single limitation: that she perform "simple, uncomplicated tasks with routine supervision." (R. 331).

Based on plaintiff's residual functional capacity, the ALJ found that plaintiff could return to her previous work as a janitor or perform one of the following jobs: mail clerk, sorting, office helper, assembly, and miscellaneous labor. (R. 336-37). Accordingly, the ALJ concluded that plaintiff was not disabled. (R. 337).

## ANALYSIS

Plaintiff claims to raise only two points of error in her brief relating to the ALJ's hypothetical and the ALJ's credibility determination. Much of plaintiff's brief argues that the ALJ failed to include necessary findings in the hypothetical that he posed to the vocational expert; however, a close reading of the brief reveals that plaintiff has raised multiple points of error in four areas: (1) the list of plaintiff's severe impairments; (2) the ALJ's residual functional capacity analysis; (3) the hypothetical that the ALJ proposed to the vocational expert; (4) the ALJ's credibility determination; and (5) plaintiff's procedural due process rights. Accordingly, the Court will address those points of error under these five categories.

**<u>Severe Impairments</u>**

Plaintiff argues that the ALJ failed to include borderline personality disorder in plaintiff's list of severe impairments. (Dkt. # 12 at 3-4). Plaintiff notes that Dr. Morgan diagnosed her with borderline personality disorder and that Dr. Hansen found it "probable" that plaintiff had the disorder. (R. 150, 478). Both of these doctors examined plaintiff. The consulting physicians did not examine plaintiff, and neither included borderline personality disorder as one of plaintiff's mental health diagnoses or impairments. (R. 157, 171, 482, 486).

The ALJ opted to give "great weight" to the Administration's consulting psychologists rather than the examining psychologists, but he offered no explanation for rejecting the opinions of the examining psychologists. (R. 335-36). The regulations provide that "[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(1) and SSR 96-6p). Just as an ALJ is required to explain his reasoning for rejecting a treating physician's opinion in favor of an examining physician's opinion, so is an ALJ required to explain his reasoning for rejecting an examining physician's opinion in favor of a reviewing physician's opinion. <u>See</u> <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); <u>Thomas v. Barnhart</u>, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

Because the ALJ failed to specify his reasons for rejecting the examining psychologists' opinions, which included a diagnosis of borderline personality disorder and "probable"

borderline personality disorder, the Court must remand the case. See <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1299 (10th Cir. 2003). On remand, the ALJ must state his reasons for rejecting the examining psychologists' opinions. Without this analysis, the Court "cannot meaningfully review the ALJ's determination" of plaintiff's severe impairments. <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1214 (10th Cir. 2001) (citing <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009 (10th Cir. 1996)).

**<u>Residual Functional Capacity</u>**

Although plaintiff argues that the ALJ failed to address all of the requirements of a proper hypothetical, several of the errors that plaintiff argues are better suited to an analysis of the ALJ's findings with respect to plaintiff's residual functional capacity. Those issues include the following: (1) failure to include the restrictions listed in the PRT and mental residual functional capacity forms; (2) failure to consider Dr. LaGrand's finding that plaintiff would have difficulty with attendance as a restriction; and (3) error in finding plaintiff capable of light work despite her complaints of physical pain and the lack of a physical residual functional capacity assessment. (Dkt. # 12 at 4-6).

The first PRT form found that plaintiff had moderate restrictions in maintaining social function and in concentration, persistence, and pace. (R. 157). The second PRT form found that plaintiff had moderate restrictions in her activities of daily living, in maintaining social function and in concentration, persistence, and pace. (R. 486). The PRT forms also concluded that plaintiff should not have any close interaction with people. (R. 157, 486). Similarly, the two mental residual functional capacity forms in the record indicated that plaintiff had a marked limitation in social interaction. (R. 171, 482). The reviewing psychologist concluded that plaintiff could only work in a position where she had limited interaction with a small, "familiar" group of coworkers and supervisors. (R. 173, 484).

The ALJ specifically gave "great weight" to these opinions in his decision. (R. 335-36). Accordingly, he was required to explain his reasons for rejecting a portion of the medical opinions he adopted. See Haga v. Astrue, 482 F.3d 1205, 1208 (10th Cir. 2007). Under these circumstances, remand is required to permit the ALJ to explain why he seemingly rejected portions of the medical opinions he adopted.[4] See id. Even if the ALJ did not intend to reject the portions of the medical opinions finding that plaintiff had moderate and marked limitations, he was required to include them in his residual function capacity findings and in his hypothetical to the vocational expert.[5] See id. (holding that moderate restrictions should be included in the residual functional capacity determination). The ALJ will also be required to include the marked limitation on plaintiff's ability to maintain social function and interact appropriately with others, as a marked limitation is more severe than a moderate limitation.

Conversely, the ALJ was not necessarily required to include Dr. LaGrand's opinion that plaintiff likely would struggle with attendance. Dr. LaGrand was the only medical source who

---

[4] Even though the Court has already held that the ALJ improperly adopted the opinions of the reviewing psychologists without explaining his reasons for rejecting the examining psychologists' opinions, this analysis is still proper. If, on remand, the ALJ conducts the proper analysis and maintains his position on the reviewing psychologists' opinion, he will still need to address the reasons he failed to adopt the findings in the PRT and mental residual functional capacity forms.

[5] The only restriction in the ALJ's hypothetical was that plaintiff be limited to performing "simple, uncomplicated tasks under routine supervision." The Tenth Circuit Court of Appeals has held that the terms "simple" and "unskilled work" do not adequately incorporate a claimant's restrictions arising from a mental impairment. See Wiederholt v. Barnhart, 121 Fed.Appx. 833, 839 (10th Cir. 2005).

made such a finding; therefore, her opinion may or may not be included in the ALJ's findings on remand, depending on the ALJ's amended finding on remand.[6]

Plaintiff also argues that the ALJ erred in finding plaintiff capable of performing light work without the benefit of a physical residual functional capacity assessment. The ALJ failed to explain his reasoning in concluding that plaintiff was able to perform light work. The ALJ must make findings and support those findings with evidence contained in the record. "In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that [the claimant's] impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion." Clifton, 79 F.3d at 1009. Remand is also appropriate on this issue.

**The ALJ's Hypothetical**

Plaintiff contends that the ALJ erred in failing to include a number of specific requirements necessary to establish a valid hypothetical. (Dkt. # 12 at 2-3). More precisely, plaintiff argues that the ALJ should have included specific statements regarding the strength requirements for light work and plaintiff's age and educational background. Id. Plaintiff also argues that the ALJ erred by failing to ask the vocational expert whether his testimony deviated from the listings in the *Dictionary of Occupational Titles*.

An ALJ's hypothetical question to a vocational expert at step five of the analysis must accurately and precisely reflect all of the "impairments and limitations that are borne out by the evidentiary record." Decker v. Chater, 86 F.3d 953 (10th Cir. 1996). See also Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) (citation omitted). In order for the vocational expert's

---

[6] Plaintiff also contends that the ALJ failed to perform a proper residual functional capacity analysis under Winfrey v. Chater, 92 F.3d 1017 (10th Cir. 1996). The Court's holding is essentially a finding that the ALJ erred in conducting the first step of the three-part Winfrey test. Accordingly, the Court does not need to address the other two steps.

hypothetical to constitute substantial evidence that a claimant is not disabled, the hypothetical must include adequate statements regarding the claimant's impairments. See Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993).

With respect to plaintiff's arguments for inclusion of specific strength requirements and details of plaintiff's age and background, the Court finds Qualls v. Astrue, 428 Fed.Appx. 841 (10th Cir. 2011) on point and persuasive.[7] In Qualls, the Tenth Circuit Court of Appeals rejected the argument that an ALJ's hypothetical, which set the parameters for exertional demands by listing the different categories, was improper. See Qualls, 428 Fed.Appx. at 850-51. In this case, the ALJ asked the vocational expert to consider a hypothetical claimant of plaintiff's age with plaintiff's educational background who was able to do light work. (R. 546). This statement was sufficient to establish a precise hypothetical with respect to those points.

Plaintiff's argument that the ALJ committed reversible error when he failed to ask the vocational expert whether his testimony deviated from the *Dictionary of Occupational Titles* is also without merit. Social Security Ruling 00-4p states that an ALJ is required to inquire whether the vocational expert's testimony is consistent with the dictionary's information. If there is a conflict between the testimony and the dictionary, the vocational expert must provide "a reasonable explanation for the conflict" before the ALJ may rely on the testimony. SSR 00-4p. Failure to make the inquiry, however, is harmless error if no conflicts exist. See Poppa v. Astrue, 569 F.3d 1167, 1173 (10th Cir. 2009). Here, plaintiff fails to articulate which of the occupations the vocational expert listed conflict with the stated hypothetical. Accordingly, the Court finds no conflict, and the ALJ's failure to inquire constitutes harmless error.

---

[7] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

**Credibility Determination**

Plaintiff argues that the ALJ's credibility determination was improper because the ALJ used boilerplate language and failed to articulate which portions of plaintiff's testimony were unsupported by the record evidence. (Dkt. # 12 at 7-9). Plaintiff also argues that the ALJ deemed plaintiff "inconsistent when reporting her consumption of alcohol to interviewers" without identifying those inconsistencies. (Dkt. # 12 at 9). Plaintiff further notes that plaintiff's former drug and alcohol abuse were not material to the ALJ's decision. Id.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008)(citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

In this case, the ALJ failed to make a proper credibility determination. The ALJ cited extensively to the record evidence, including plaintiff's testimony. The analysis of plaintiff's credibility, however, is found in one sentence: "The claimant was inconsistent when she reported to [sic] drug and alcohol abuse to the examining doctors and exaggerated the effects of her

16

impairments." (R. 336). An ALJ's "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler, 68 F.3d at 391.

While the ALJ does cite to plaintiff's reports of her drug and alcohol abuse in his recitation of the evidence, he does not link that evidence to his conclusion, leaving the Court to link the ALJ's findings of fact with his credibility determination. However, the ALJ's conclusory statement that plaintiff "exaggerated the effects of her impairments" is not supported by the record, and the ALJ failed to cite any examples to support this conclusion. (R. 336). While an ALJ is not required to "do a 'factor-by-factor' analysis in assessing credibility," the ALJ must support his findings with substantial evidence. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Accordingly, the Court must remand the case for the ALJ to make proper credibility findings.

**Procedural Due Process**

Finally, plaintiff argues that the ALJ denied her the right to procedural due process when he refused to allow plaintiff's attorney to cross-examine the vocational expert on two issues. First, plaintiff's attorney asked the vocational expert whether production quotas associated with an occupation would increase the stress associated with performing that job. (R. 549). The ALJ refused to allow the vocational expert to answer that question. The ALJ also forbid any discussion of Global Assessment of Functioning ("GAF") scores and their impact on plaintiff's ability to work. Id. Plaintiff was entitled to cross-examine the vocational expert. See Glass v. Shalala, 43 F.3d 1392, 1396 (10th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 402, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The Tenth Circuit Court of Appeals has determined, however, that cross-examination should be limited, due to its adversarial nature, as social

security disability proceedings are non-adversarial. See Haddock v. Apfel, 196 F.3d 1084, 1091-91 (10th Cir. 1999). The case law does not clearly define the balance of these two principles.

In light of plaintiff's PTSD diagnosis and its accompanying feelings of anxiety and panic, the Court finds that the question regarding stress was appropriate. Likewise, the question regarding GAF scores was appropriate. A GAF score "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1122 n.2 (10th Cir. 2004) (citing American Psychatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000)). The Tenth Circuit Court of Appeals has previously permitted consideration of such questions. See Petree v. Astrue, 260 Fed.Appx 33, 41-42 (10th Cir. 2007); Heinritz v. Barnhart, 191 Fed.Appx 718, 722 (10th Cir. 2006). Because these questions were proper, the Court holds that the ALJ erred in refusing to allow plaintiff's attorney to cross-examine these issues. Although the Court is aware of the limitations of cross-examination, because the cross-examination impacts plaintiff's procedural due process rights, the Court will err on the side of caution in protecting those rights. Accordingly, the Court remands the case to allow plaintiff an opportunity for meaningful cross-examination of the vocational expert.

## CONCLUSION

For the foregoing reasons, this Court REVERSES and REMANDS the ALJ's decision denying plaintiff's application for disability insurance benefits. On remand, the ALJ shall take the following steps:

(1) Specify his reasons for adopting the consulting psychologists' opinions over those of the examining psychologists;

(2) Explain his reasons for rejecting the consulting psychologists' findings that plaintiff suffered moderate and marked limitations. If the ALJ did not intend to reject those findings, then the ALJ shall incorporate them into his amended residual functional capacity analysis;

(3) Pose a new hypothetical to the vocational expert that incorporates the amended residual functional capacity analysis;

(4) Conduct proper credibility findings; and

(5) Permit plaintiff's attorney to cross-examine the vocational expert.

SO ORDERED this 31st day of March, 2012.

_____
T. Lane Wilson
United States Magistrate Judge